# 12-1640-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

AMERICAN INTERNATIONAL GROUP, INC., AIG SECURITIES LENDING
CORPORATION, AMERICAN GENERAL ASSURANCE COMPANY,

*(For Continuation of Caption See Inside Cover)*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

MARC T.G. DWORSKY
FRED A. ROWLEY, JR.
MICHAEL J. MONGAN
MUNGER, TOLLES & OLSON LLP
*Counsel for Appellees Bank of America
    Corporation, Banc of America
    Securities LLC, Bank of America,
    National Association, Banc of America
    Funding Corporation, Banc of
    America Mortgage Securities, Inc.,
    Asset Backed Funding Corporation,
    NB Holdings Corporation, Merrill
    Lynch & Co., Inc., Merrill Lynch
    Mortgage Lending, Inc., First
    Franklin Financial Corporation,
    Merrill Lynch Mortgage Capital Inc.,
    Merrill Lynch Credit Corporation,
    Merrill Lynch, Pierce, Fenner & Smith
    Incorporated and Merrill Lynch
    Mortgage Investors, Inc.*
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Tel.: (213) 683-9100

AMY J. GREER
JAMES C. MARTIN
COLIN E. WRABLEY
REED SMITH LLP
*Counsel for Appellees Countrywide
    Financial Corporation, Countrywide
    Capital Markets LLC, Countrywide
    Home Loans, Inc., Countrywide
    Securities Corporation, CWABS,
    Inc., CWALT, Inc., CWHEQ, Inc.
    and CWMBS, Inc.*
599 Lexington Avenue
New York, New York 10022
Tel.: (212) 521-5400

AMERICAN GENERAL LIFE AND ACCIDENT INSURANCE COMPANY,
AMERICAN GENERAL LIFE INSURANCE COMPANY, AMERICAN
GENERAL LIFE INSURANCE COMPANY OF DELAWARE, AMERICAN
HOME ASSURANCE COMPANY, AMERICAN INTERNATIONAL GROUP
RETIREMENT PLAN, CHARTIS PROPERTY CASUALTY COMPANY,
CHARTIS SELECT INSURANCE COMPANY, CHARTIS SPECIALTY
INSURANCE COMPANY, COMMERCE AND INDUSTRY INSURANCE
COMPANY, FIRST SUNAMERICA LIFE INSURANCE COMPANY,
LEXINGTON INSURANCE COMPANY, NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PA, NEW HAMPSHIRE
INSURANCE COMPANY, SUNAMERICA ANNUITY AND LIFE
ASSURANCE COMPANY, SUNAMERICA LIFE INSURANCE COMPANY,
THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, THE
UNITED STATES LIFE INSURANCE COMPANY IN THE CITY OF NEW
YORK, THE VARIABLE ANNUITY LIFE INSURANCE COMPANY,
WESTERN NATIONAL LIFE INSURANCE COMPANY,

*Plaintiffs-Appellants*,

v.

BANK OF AMERICA CORPORATION, BANC OF AMERICA SECURITIES
LLC, BANK OF AMERICA, NATIONAL ASSOCIATION, BANC OF
AMERICA FUNDING CORPORATION, BANC OF AMERICA MORTGAGE
SECURITIES, INC., ASSET BACKED FUNDING CORPORATION, NB
HOLDINGS CORPORATION, MERRILL LYNCH & CO., INC., MERRILL
LYNCH MORTGAGE LENDING, INC., FIRST FRANKLIN FINANCIAL
CORPORATION, MERRILL LYNCH MORTGAGE CAPITAL INC.,
MERRILL LYNCH CREDIT CORPORATION, MERRILL LYNCH, PIERCE,
FENNER & SMITH INC., MERRILL LYNCH MORTGAGE INVESTORS,
INC., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE
HOME LOANS, INC., COUNTRYWIDE SECURITIES CORPORATION,
CWABS, INC., COUNTRYWIDE CAPITAL MARKETS LLC, CWALT, INC.,
CWHEQ, INC., CWMBS, INC.,

*Defendants-Appellees*.

## CORPORATE DISCLOSURE STATEMENT (RULE 26.1)

Bank of America Corporation ("Bank of America") is a publicly-traded corporation.  No publicly-held corporation or investment fund owns 10% or more of Bank of America's shares.

All of the following entities are direct or indirect subsidiaries of Bank of America and no publicly-held corporation or investment fund other than Bank of America owns 10% or more of their shares:  Bank of America, National Association; Banc of America Funding Corporation; Banc of America Mortgage Securities, Inc.; Asset Backed Funding Corporation; and NB Holdings Corporation (collectively, the "Bank of America entities").

All of the following entities are direct or indirect subsidiaries of Bank of America and no publicly-held corporation or investment fund other than Bank of America owns 10% or more of their shares:  Merrill Lynch & Co., Inc.; Merrill Lynch Mortgage Lending, Inc.; First Franklin Financial Corporation; Merrill Lynch Mortgage Capital Inc.; Merrill Lynch Credit Corporation; Merrill Lynch, Pierce, Fenner & Smith Incorporated; and Merrill Lynch Mortgage Investors, Inc. (collectively, the "Merrill Lynch entities").

Effective November 1, 2010, Banc of America Securities LLC merged with and into Merrill Lynch, Pierce, Fenner & Smith Incorporated.  Merrill Lynch, Pierce, Fenner & Smith Incorporated is an indirect subsidiary of Bank of America.

No publicly-held corporation or investment fund other than Bank of America owns 10% or more of Merrill Lynch, Pierce, Fenner & Smith Incorporated's shares.

The following entities are also direct or indirect subsidiaries of Bank of America and no publicly-held company or investment fund other than Bank of America owns 10% or more of their shares:  Countrywide Financial Corporation; Countrywide Capital Markets, LLC; Countrywide Home Loans, Inc.; Countrywide Securities Corporation; CWABS, Inc.; CWALT, Inc.; CWHEQ, Inc.; and CWMBS, Inc. (collectively, the "Countrywide entities").

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT (RULE 26.1) ...................................i

INTRODUCTION ................................................................1

ISSUE PRESENTED ............................................................4

STATEMENT OF THE CASE .....................................................5

STATEMENT OF FACTS .......................................................6

I.     How Mortgage Pass-Through Certificates Work ...........................6

II.    The Parties ..........................................................8

III.   AIG's Complaint ......................................................9

IV.    The Removal and Motion to Remand ...................................11

V.     The District Court's Orders ..........................................14

SUMMARY OF ARGUMENT ....................................................16

ARGUMENT ...................................................................19

I.     The District Court Correctly Held that it Had Removal Jurisdiction
       Under the Edge Act ..................................................19

       A.     Section 632 Confers Subject Matter Jurisdiction Because AIG's
              Suit Arises Out of Territorial Banking Transactions ................19

              1.     Section 632 is Met if Any Part of the Challenged
                     Transaction Was Connected to Territorial Banking ...............21

              2.     AIG's Claims and Allegations Establish that its Suit
                     Arises Out of Transactions Involving Territorial Banking ......23

              3.     The Nexus Between AIG's Claims and the Individual
                     Mortgages is More than Sufficient for Edge Act
                     Jurisdiction .................................................27

       B.     AIG's Jurisdictional Challenge Belies its Own Allegations and
              Fundamentally Misconstrues Section 632 .........................30

              1.     AIG's Complaint Forecloses its Effort to Break Apart
                     Mortgage-Backed Securities From Individual Mortgages ......31

## TABLE OF CONTENTS
(continued)

**Page**

2.    AIG's Narrowing Construction of Section 632's "Arising Out Of" Language is Countertextual and Contrary to the Statute's Purpose.................................................................37

3.    AIG's Narrowing Construction is Unsupported by Case Law Construing Section 632 ...................................................41

4.    The Standard Governing Specific Personal Jurisdiction Cannot Be Imported into Section 632 ....................................45

C.    Section 632 Contains No Requirement that a National Bank Must be Directly Involved in the Territorial Banking Activity ........49

D.    Section 632 Contains No *De Minimis* Exception ..........................56

CONCLUSION ....................................................................................61

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ...................................63

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.*,
  62 F.3d 1454 (D.C. Cir. 1995)........................................................39, 54, 55, 56

*Acosta v. Master Maintenance & Constr. Inc.*,
  452 F.3d 373 (5th Cir. 2006) ................................................................38

*Al Shimari v. CACI Int'l, Inc.*,
  679 F.3d 205 (4th Cir. 2012) ................................................................21

*Arciniaga v. Gen. Motors Corp.*,
  460 F.3d 231 (2d Cir. 2006) ................................................................38

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ................................................................24

*Bank of America Corp. v. Lemgruber*,
  385 F. Supp. 2d 200 (S.D.N.Y. 2005) ........................................................*passim*

*Bank of New York v. Bank of America*,
  861 F. Supp. 225 (S.D.N.Y. 1994) ................................................16, 41, 42, 51

*Barnhart v. Thomas*,
  540 U.S. 20 (2003)................................................................50, 51

*Bass v. Stolper, Koritzinsky, Brewster & Neider*,
  111 F.3d 1322 (7th Cir. 1997) ................................................................22

*Boatswain v. Gonzales*,
  414 F.3d 413 (2d Cir. 2005) ................................................................51

*Bosky v. Kroger Texas, LP*,
  288 F.3d 208 (5th Cir. 2002) ................................................................38

*Burgos v. Citibank, N.A.*,
  432 F.3d 46 (1st Cir. 2005)................................................................1, 21, 45

*CIR v. Lundy*,
  516 U.S. 235 (1996)................................................................46

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Chase Manhattan Bank (N.A.) v. Corporacion Hotelera de Puerto Rico*,
  516 F.2d 1047 (1st Cir. 1975)...................................................................23, 45

*City of Stockton v. Bank of America, N.A.*,
  No. CV 08-4060-MMC (N.D. Cal. Oct. 3, 2008) ...........................................58

*Clark v. Martinez*,
  543 U.S. 371 (2005).......................................................................................53

*Clarken v. Citicorp Diners Club, Inc.*,
  2001 WL 1263366 (N.D. Ill. Oct. 22, 2001) ....................................................45

*Colorado River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976).....................................................................................4, 19

*Commodity Futures Trading Comm'n v. Schor*,
  478 U.S. 833 (1986).......................................................................................53

*Conjugal Society Composed of Juvenal Rosa v. Chicago Title Insurance Co.*,
  690 F.2d 1 (1st Cir. 1982)............................................................................24, 45

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*,
  629 F.2d 786 (2d Cir. 1980) .........................................................................*passim*

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*,
  477 F. Supp. 615 (S.D.N.Y. 1979) ..................................................................29

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*,
  No. 76-cv-1671 (S.D.N.Y. 1976) ....................................................................43

*Cote v. Wadel*,
  796 F.2d 981 (7th Cir. 1986) .......................................................................58, 60

*Diaz v. Pan American Federal Savings & Loan Ass'n*,
  635 F.2d 30 (1st Cir. 1980).........................................................................43, 44

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades
  Council*,
  485 U.S. 568 (1988)........................................................................................53

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Emerald Investors Trust v. Gaunt Parsippany Partners*,
492 F.3d 192 (3rd Cir. 2007)................................................................58

*Erlenbaugh v. United States*,
409 U.S. 239 (1972)..........................................................................47

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005)......................................................................3, 38

*Fed. Home Loan Bank of Boston v. Ally Fin., Inc. et al.*,
No. 11-10952 (D. Mass.) ...................................................................48

*Franklin Nat'l Bank Secs. Litig. v. Andersen*,
532 F.2d 842 (2d Cir. 1976) ..............................................................60

*Guccione v. United States*,
847 F.2d 1031 (2d Cir. 1988) ............................................................21

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561 (1995)..........................................................................47

*Hamilton v. United Healthcare of Louisiana, Inc.*,
310 F.3d 385 (5th Cir. 2002) ............................................................21

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984)....................................................................46, 47

*Hernandez Perez v. Citibank, N.A.*,
328 F. Supp. 2d 1374 (S.D. Fla. 2004).............................................21

*Hertz Corp. v. Friend*,
130 S. Ct. 1181 (2010)......................................................................58

*Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.*,
627 F. Supp. 2d 730 (N.D. Tex. 2008).........................................41, 51

*Huffington v. T.C. Group, LLC*,
637 F.3d 18 (1st Cir. 2011)...............................................................25

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Illinois Power Co. v. CIR*,
792 F.2d 683 (7th Cir. 1986) ..............................................................42

*In re Barbieri*,
199 F.3d 616 (2d Cir. 1999) ...............................................................46

*In re Lloyd's Am. Trust Fund Litig.*,
928 F. Supp. 333 (S.D.N.Y. 1996) ..................................23, 28, 41, 57

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
456 U.S. 694 (1982)............................................................................48

*Jana Master Fund, Ltd. v. JP Morgan Chase & Co.*,
490 F. Supp. 2d 325 (S.D.N.Y. 2007) .........................................38, 51

*Lazard Freres & Co. v. First Nat'l Bank of Md.*,
1991 WL 221087 (S.D.N.Y. Oct. 15, 1991).......................................52

*Lee v. Bankers Trust Co.*,
166 F.3d 540 (2d Cir. 1999) ...............................................................21

*Lewis v. City of Chicago*,
130 S. Ct. 2191 (2010)........................................................................45

*Microsoft Corp. v. i4i Ltd. P'ship*,
131 S. Ct. 2238 (2011)........................................................................46

*Miller v. French*,
530 U.S. 327 (2000)............................................................................53

*Mobil Oil Corp. v. Higginbotham*,
436 U.S. 618 (1978)............................................................................39

*New Mexico ex rel. Foy v. Vanderbilt Capital Advisors, LLC*,
2009 WL 3672921 (D.N.M. Apr. 13, 2009)....................40, 41, 52, 60

*O'Keeffe v. Smith, Hinchman & Grylls Assocs., Inc.*,
380 U.S. 359 (1965)............................................................................21

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Pinto v. Bank One Corp.*,
2003 WL 21297300 (S.D.N.Y. June 4, 2003) ......................................23, 52, 59

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
551 U.S. 224 (2007)................................................................................57

*Racepoint Partners, LLC v. JPMorgan Chase Bank*,
2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006).......................................44

*Ruhrgas AG v. Marathon Oil Co.*,
526 U.S. 574 (1999)...........................................................................47, 48

*Samsun Logix Corp. v. Bank of China*,
740 F. Supp. 2d 484 (S.D.N.Y. 2010) ............................................39, 40

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
131 S. Ct. 1885 (2011).............................................................................22

*Societe d'Assurance de l'Est SPRL v. Citigroup Inc.*,
2011 WL 4056306 (S.D.N.Y. Sept. 13, 2011) ..................................52

*Sollitt v. Keycorp*,
463 F. App'x 471, 2012 WL 284389 (6th Cir. 2012) ............................43, 44, 59

*Spina v. Dep't of Homeland Security*,
470 F.3d 116 (2d Cir. 2006) .................................................................53

*Stamm v. Barclays Bank of New York*,
1996 WL 614087 (S.D.N.Y. Oct. 24, 1996).......................................52

*United States v. Ron Pair Enterprises, Inc.*,
489 U.S. 235 (1989)................................................................................50

*United States v. Tohono O'Odham Nation*,
131 S. Ct. 1723 (2011)............................................................................39

*United States v. Vickers*,
540 F.3d 356 (5th Cir. 2008) .................................................................22

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Webster v. Fall*,
266 U.S. 507 (1925)................................................................52

*Wright v. Ernst & Young LLP*,
152 F.3d 169 (2d Cir. 1998) ............................................35

**STATE CASES**

*Fed. Home Loan Bank of Atlanta v. Countrywide Fin. Corp. et al.*,
No. 11EV011779G (Ga. State Ct.)....................................48

*Fed. Home Loan Bank of Chicago v. Banc of America Funding Corp. et al.*,
No. 10CH45033 (Ill. Cir. Ct.)...........................................48

*Fed. Home Loan Bank of Chicago v. Banc of America Secs. LLC et al.*,
No. LC091499 (Cal. Super. Ct.)........................................48

*Fed. Home Loan Bank of Indianapolis v. Banc of America Mortgage Secs., Inc. et al.*,
No. 49D051010PL045071 (Ind. Super. Ct.).......................48

*Fed. Home Loan Bank of Pittsburgh v. J.P. Morgan Secs. Inc. et al.*,
No. GD-09-016892 (Pa. C.P.) ..........................................48

*Fed. Home Loan Bank of Seattle v. Bear, Stearns & Co., Inc. et al.*,
No. 09-2-46298-4 (Wash. Super. Ct.) ...............................48

**FEDERAL STATUTES**

12 U.S.C. §§ 501-04 .........................................................55

12 U.S.C. § 632................................................................*passim*

28 U.S.C. § 1292(b)............................................................5

28 U.S.C. § 1332................................................................60

28 U.S.C. § 1334(b)...........................................................16

28 U.S.C. § 1452(a)...........................................................16

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Securities Act of 1933, §§ 11, 12(a)(2), 15 ........................................11, 55

**FEDERAL REGULATIONS**

12 C.F.R. § 211.10(a)(2)............................................................24

**LEGISLATIVE MATERIALS**

75 Cong. Rec. 9883-84 (1932)....................................................40

S. Rep. No. 584 (1932) ..............................................................40

**OTHER AUTHORITIES**

Andrews, Edmund L., *et al.*, *Fed in an $85 Billion Rescue of an Insurer Near Failure*, N.Y. TIMES, Sept. 17, 2008............................................8

Brill, Robert M. & Bjorkman, James J., *Federal Court Jurisdiction Over International Banking Transactions*, 110 BANKING L.J. 118 (1993)...............28

Dash, Eric & Sorkin, Andrew Ross, *Throwing a Lifeline to a Troubled Giant*, N.Y. TIMES, Sept. 18, 2008 .......................................................8

Davidoff, Steven M., *Section 632: An Expanded Basis of Federal Jurisdiction for National Banks*, 123 BANKING L.J. 687 (2006) .................18, 33

de la Merced, Michael J. & Otterman, Sharon, *A.I.G. Takes Its Session in Hot Seat*, N.Y. TIMES, Oct. 7, 2008 ......................................................8

FABOZZI, FRANK J., ET AL., MORTGAGE-BACKED SECURITIES (2007).....................33

HU, JOSEPH, BASICS OF MORTGAGE-BACKED SECURITIES (2d ed. 2001)................32

WEBSTER'S THIRD NEW INT'L DICT. (2002) .............................................22

SINGER, JOSEPH W., PROPERTY LAW (3d ed. 2002) ..................................33

## INTRODUCTION

The district court properly exercised jurisdiction under the Edge Act, 12 U.S.C. § 632 ("Section 632").  In Section 632, Congress gave district courts original and removal jurisdiction over lawsuits to which "any corporation organized under the laws of the United States shall be a party."  Using words marked by expansiveness, Congress established jurisdiction over all such suits "of a civil nature ... arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession [*e.g.,* a territory] of the United States."  The phrase "arising out of" is "notoriously" broad, *Burgos v. Citibank, N.A.*, 432 F.3d 46, 50 (1st Cir. 2005), and Congress married it to other broad language—"transactions involving"—in fixing the scope of banking-related activity establishing jurisdiction.  That is why courts "have consistently interpreted the Edge Act's jurisdictional provision broadly," applying Section 632 in cases "'containing only an incidental connection to banking law,' and 'even though the international or foreign banking activity was not central to the case.'"  *Bank of America Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 214 (S.D.N.Y. 2005) (citation omitted).

As the district court recognized, the lawsuit filed by Plaintiffs/Appellants American International Group, Inc. *et al.* ("AIG") plainly meets Section 632's requirements.  AIG's lawsuit is civil in nature.  It names as a defendant a federally

chartered bank, Bank of America, N.A. ("BANA").  And it arises out of

transactions involving territorial banking, because AIG seeks recovery for alleged

financial losses from mortgage-backed securities—securities bound up with

individual mortgage transactions, including mortgages on properties in Puerto

Rico, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands.

 The connections between AIG's claims and territorial mortgages are direct

and undisputed.  Mortgage-backed securities "pass[] through" mortgage payments

made by individual homeowners to security holders like AIG.  (Compl. ¶ 79; JA

87.)[1]  AIG alleges that it lost money as a "direct result" of the individual mortgages

comprising the securities and purported "shortfalls in the principal and interest

payments to which it was entitled."  (Compl. ¶ 376; JA 207.)  Each of AIG's

claims challenges representations about the mortgage loans comprising the

securities, alleging that Defendants misrepresented the underwriting process for

and characteristics of the loans.  Indeed, according to AIG, it is "the complete loan

files" for *individual* mortgages that ultimately "will demonstrate" the alleged

"fraud perpetrated by Defendants."  (Compl. ¶ 7; JA 65.)

---

[1] "Compl." refers to the operative Complaint.  "JA" refers to the parties' Joint
Appendix, and "SPA" to the Special Appendix.  "CR" refers to the Clerk's Record
in this Court, and is followed by the applicable docket number.  "AOB" refers to
Appellant's Opening Brief.

To avoid the application of Section 632 to its suit, AIG attempts to rewrite both its allegations and the statutory text.  First, AIG asserts that its claims "arise out of" only its purchase of mortgage-backed securities, and that individual mortgage loan transactions are merely "antecedent" to those securities.  (AOB 26-28, 31.)  But as the district court noted, AIG's Complaint tells a different story—one of "claims directly implicat[ing] the mortgage transactions."  (SPA 6.)  This is true not only because the mortgage transactions are built into the mortgage-backed securities purchased by AIG, but also because AIG's claims turn critically on how those transactions were initiated and how they perform *on an ongoing basis*.

Second, AIG advances multiple interpretations that would revise and distort the text of Section 632.  AIG would have the Court, variously, read jurisdictional requirements into the statute (AOB 28), conflate elements that the statutory text distinguishes (*id.* at 38-43), and carve out a new exception for cases that, in AIG's eyes, should not be removable (*id.* at 44).  The district court was right to reject these efforts to amend the statute.  While courts "must not give jurisdictional statutes a more expansive interpretation than their text warrants[,] … it is just as important not to adopt an artificial construction that is narrower than what the text provides."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005).  Congress used broad language to define the removal right in Section 632.  That

right cannot be abridged without violating numerous canons of statutory construction and defeating Congress's objectives.

Federal courts have a "virtually unflagging obligation … to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Because AIG's action falls within Section 632's grant of removal jurisdiction, the district court properly refused to remand. This Court should affirm.

## ISSUE PRESENTED

Section 632 creates federal subject matter jurisdiction over "all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving … banking in a dependency or insular possession of the United States."

The issue presented here is whether subject matter jurisdiction exists under this provision given that AIG's lawsuit:

(a)    is a civil suit that asserts common law claims;

(b)    names as a party defendant a national bank that is a "corporation organized under the laws of the United States"; and

(c)    arises out of individual mortgage loan transactions, including mortgage loans on properties in U.S. territories.

## STATEMENT OF THE CASE

AIG filed its Complaint in the Supreme Court of the State of New York on August 8, 2011.  (JA 56.)  The lawsuit challenged representations made in offering documents for some 349 mortgage-backed securities that AIG purchased.  (Compl. ¶¶ 2, 102-04; JA 63, 95-96.)

On September 6, 2011, Defendants removed the action to the U.S. District Court for the Southern District of New York, asserting subject matter jurisdiction under, *inter alia*, the Edge Act.  (JA 276-80.)  AIG moved to remand for lack of subject matter jurisdiction or, alternatively, for equitable remand or abstention.  (CR 23.)  On October 20, 2011, the district court issued an order denying the motion, and determining that it had Edge Act jurisdiction.  (SPA 2-9).

AIG filed a motion for reconsideration.  It also requested, in the alternative, that the district court certify its Edge Act ruling for interlocutory appeal under 28 U.S.C. § 1292(b).  (CR 46.)  On December 20, 2011, the court issued an order denying reconsideration, but certifying its Edge Act ruling for appeal.[2]  (SPA 10-24.)

---

[2] On December 21, 2011, the Judicial Panel on Multidistrict Litigation issued an order transferring AIG's claims concerning certain mortgage-backed securities created or sold by Countrywide entities to a Multidistrict Litigation pending in the Central District of California.  (SPA 25-26.)  The order directed that the balance of AIG's claims should remain in the Southern District of New York.  (*Id.*)

AIG filed its petition for permission to appeal to this Court on December 30, 2011, and this Court granted the petition on April 25, 2012.

## STATEMENT OF FACTS

The jurisdictional dispute here centers on the nature of AIG's claims for relief.  Defendants therefore take the allegations in the Complaint as true for purposes of this appeal.  The pertinent "facts," as alleged in the Complaint and reflected in the challenged offering documents, are these:

## I.     How Mortgage Pass-Through Certificates Work

AIG's lawsuit concerns mortgage "pass-through" certificates, commonly referred to as mortgage-backed securities.  These certificates give the purchaser the right to receive a stream of payments based on principal and interest payments made by borrowers of residential mortgage loans.  (Compl. ¶¶ 79-81; JA 87-88.) The certificates are created by "securitiz[ing]" a pool of individual mortgages and the payments made by the borrowers on those loans.  (Compl. ¶ 81; JA 88.)

To create a mortgage-backed security, a "sponsor" first acquires a pool of mortgage loans.  (Compl. ¶ 80; JA 87.)  Sometimes, the sponsor is affiliated with the lender that originated the mortgages; in other instances, it purchases the mortgages from another originator.  (*Id.*)  The loans may include a variety of different mortgages, including first and second liens and fixed or adjustable-rate mortgages.  (*Id.*)  A "depositor" then acquires these mortgages from the sponsor,

deposits them into an issuing trust, and establishes rights to the payment streams from the mortgages.  (Compl. ¶¶ 80-81; JA 87-88.)  The rights are divided into tiers or "tranches" with different levels of risk and rates of return.  (Compl. ¶ 81; JA 88.)  Tranches are paid in descending order, with the junior tranches receiving progressively higher interest to compensate for the increased risk that revenue streams might be exhausted by more senior tranches.  (*Id.*)

Each mortgage pass-through certificate represents an equity interest in a specific tranche.  (Compl. ¶ 81; JA 88.)  Once the tranches are established, the issuing trust transfers the certificates back to the depositor, who issues the securities and sells them to underwriters.  (Compl. ¶¶ 82-83; JA 88.)  The underwriters in turn offer the certificates to investors.  (*Id.*)

Mortgage-backed securities are issued pursuant to offering documents filed with the SEC.  (Compl. ¶¶ 103-105; JA 95-96.)  The depositor initially files a "shelf" registration statement for a contemplated series of certificates, followed by a prospectus supplement for particular certificates.  (Compl. ¶¶ 104-06; JA 95-96.)  The prospectus supplement contains a detailed description of the residential mortgage pools underlying the certificates, typically specifying, among other things:

- The types of residential mortgage loans (*e.g.*, first or second);

- The interest rates on the mortgages;

- The types of property securing the mortgages;

- The borrowers' debt-to-income ratios;

- Owner occupancy information for the mortgaged properties; and

- The location of the mortgaged properties, including whether the properties were in U.S. territories.

(*Id.*; *see also* JA 379-400.)

## II.    The Parties

AIG is the world's largest insurance company, Eric Dash & Andrew Ross Sorkin, *Throwing a Lifeline to a Troubled Giant*, N.Y. TIMES, Sept. 18, 2008, at C1, "a sprawling empire" with "hundreds of businesses all over the world," Edmund L. Andrews *et al.*, *Fed in an $85 Billion Rescue of an Insurer Near Failure*, N.Y. TIMES, Sept. 17, 2008, at A1.  AIG "became embroiled in the mortgage crisis," both because it had "mortgage-backed securities on [its] books" during the 2008 global recession, and because of insurance products "that its financial products unit offered investors for complex debt securities."  *Id.*  In 2008, AIG was rescued by an $85 billion bailout from the federal government.  *See* Michael J. de la Merced & Sharon Otterman, *A.I.G. Takes Its Session in Hot Seat*, N.Y. TIMES, Oct. 7, 2008, at B1.

AIG alleges that it purchased more than $28 billion worth of mortgage pass-through certificates that were connected to Defendants.  (Compl. ¶ 102; JA 95.)

Certain Countrywide entities are alleged to have acted principally as originators of residential mortgages; others are sued as sponsors, sellers, depositors and underwriters.  (Compl. ¶¶ 52-60, 176-281; JA 79-82, 128-67.)  Certain Merrill Lynch and Bank of America entities (including First Franklin) are sued principally as originators of mortgages, and others as sponsors, sellers, depositors, and underwriters.  (Compl. ¶¶ 61-76 282-334; JA 82-86, 167-90.)  AIG also asserts claims against BANA and certain other Bank of America entities as successors-in-interest to certain Countrywide entities.  (Compl ¶¶ 75, 379-425; JA 86, 209-224.)

## III.   AIG's Complaint

The gravamen of AIG's Complaint is that the mortgage-backed securities it purchased were "backed by hundreds of thousands of defective mortgages" issued "during the subprime lending 'gold rush' years of 2004-2007."  (Compl. ¶¶ 2, 11-13; JA 63, 67-69.)  AIG alleges that the originators of the mortgages deviated from their underwriting standards, issuing loans to buyers who were unqualified, or for residential properties with inadequate market value.  (Compl. ¶¶ 3, 16-25, 169; JA 63, 70-75, 125-26.)  The originators allegedly approved loans for borrowers who lacked the ability to repay them, or accepted income statements that they knew were false.  (*E.g.*, Compl. ¶¶ 213-21, 293, 299; JA 142-45, 171, 173.)  The originators are also alleged to have accepted and used property appraisals they knew were inflated.  (*E.g.*, Compl. ¶¶ 128-42, 239, 300, 330; JA 108-15, 151-52,

173-74, 187.)  Under AIG's theory, these practices were adopted in response to growing demand from banks creating and issuing mortgage-backed certificates. (Compl. ¶¶ 2, 88-91; JA 63, 90-91.)

AIG contends that Defendants knew about these purported underwriting defects, but misrepresented the facts or concealed them.  (Compl. ¶¶ 90-101; JA 91-95.)  These misrepresentations were allegedly made in prospectus supplements and other offering materials, in loan data supplied by Defendants, and in direct communications between Defendants and AIG.  (Compl. ¶¶ 102-08; JA 95-97.)

AIG challenges four main categories of representations:

- First, statements about the guidelines used to underwrite the individual mortgages comprising the securities.  (Compl. ¶¶ 109-111; JA 98-101.)

- Second, information about the loan-to-value ratios for the mortgage loans, which were allegedly based on inflated appraisals for the mortgaged properties.  (Compl. ¶¶ 112-16, 128-44; JA 101-04, 108-16.)

- Third, information about whether borrowers actually intended to occupy their mortgaged properties.  (Compl. ¶¶ 117-19, 145-53; JA 104-05, 116-19.)

- Fourth, credit ratings for the mortgage-backed security certificates, which were set by independent agencies and included in the offering documents.  (Compl. ¶¶ 120-23 154-68; JA 105-06, 119-25.)

Consistent with these allegations, AIG's Complaint recognizes that its claims are bound up with the mortgage loans forming the challenged securities, and with the way those loans were underwritten.  AIG avers that the "true quality and value of the [mortgage-backed securities] it was offering for sale depended on the credit quality of the mortgage loans underlying [them]."  (Compl. ¶ 5; JA 64.)  Its core theory is that "AIG purchased securities whose true risks greatly exceeded the represented ones" because "the loans backing the certificates were made to borrowers who did not have the represented ability or propensity to repay, and on properties that were overvalued."  (Compl. ¶ 371; JA 205.)  On the basis of this theory, AIG asserts federal claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the '33 Act), and state-law claims for fraudulent inducement, aiding and abetting fraudulent inducement, negligent misrepresentation, and successor liability against BANA and other defendants.  (Compl. ¶¶ 461-521; JA 234-46.)

## IV.    The Removal and Motion to Remand

AIG's suit includes claims against a federally-chartered bank, BANA.  (*See* AOB 38.)  Five of the mortgage pass-through certificates in AIG's lawsuit drew on

mortgage pools that included mortgage loans on properties in U.S. territories. (*See* AOB 9-10.)  In particular, the five securities involved mortgages for homes in Guam (BAYV 2006-A, CWALT 2005-20CB), Puerto Rico (BAYV 2006-A), the Northern Mariana Islands (BAYV 2006-B), and the U.S. Virgin Islands (BAYV 2006-B, GSR 2006-1F, and SEMT 2007-3).  (*Id.*)  The prospectus supplements for each of these securities expressly noted that the mortgaged properties may "be located in any one of the fifty states, the District of Columbia, Guam, Puerto Rico or any other territory of the United States" (CWALT 2005-20CB, GSR 2006-1F, and SEMT 2007-3; JA 379, 395, 400) or "in any state or territory of the United States or outside of the United States" (BAYV 2006-A, BAYV 2006-B; JA 384, 389).  The prospectus supplements for four of these securities also identified the number and location of mortgage loans for the territorial properties.  (BAYV 2006-A, BAYV 2006-B, CWALT 2005-20CB, and GSR 2006-1F; JA 378, 383, 387, 392-94.)

Because AIG's lawsuit concerns mortgages secured by homes in U.S. territories, Defendants invoked Edge Act jurisdiction and removed the action to federal court.  (JA 272-88.)  In its motion to remand, AIG maintained that the district court lacked Edge Act jurisdiction.  It argued that because its Complaint did not reference territorial mortgages, the Edge Act was inapplicable under the well-pleaded complaint rule.  (CR 23 at 6-7.)  It also sought to distinguish between

mortgage-backed securities and the individual mortgages comprising them, insisting its claims challenged only the former. (*Id.* at 7.) Alternatively, AIG contended that the banking activities associated with the territorial mortgages were conducted in the United States (*id.* at 7; CR 35 at 5), and that the territorial mortgages were, in any event, too "few" to support Edge Act jurisdiction (CR 23 at 8). Finally, AIG argued that Edge Act jurisdiction was unavailable because BANA was not named as a defendant "to any of AIG's claims on [securities] involving territorial U.S. mortgages." (CR 35 at 5.)

Defendants countered that the well-pleaded complaint rule was inapplicable, but that, in any event, AIG's Complaint incorporated the offering documents establishing Edge Act jurisdiction. (CR 28 at 8-10.) AIG's suit arose out of transactions involving territorial banking, Defendants explained, because "the bulk of the complaint is consumed with allegations concerning alleged difficulties in the loan underwriting process," which included loans on territorial properties. (*Id.* at 12.) Nor did the Edge Act admit of any "*de minimis*" exception based on the number of such transactions. (*Id*. at 13-15.) Finally, the claims against BANA triggered jurisdiction both because the Edge Act did not require the federally-chartered bank to be involved in the territorial transaction, and because BANA was sued as a successor in the relevant claims. (*Id.* at 15-16.)

## V.    The District Court's Orders

In its October 20, 2011 Order, the district court upheld its Edge Act jurisdiction.  The court rejected AIG's well-pleaded complaint challenge, citing Circuit authority that "§ 632 provides an explicit statutory exception to the well-pleaded complaint rule."  (SPA 5.)  The court also determined that AIG could not avoid Edge Act jurisdiction by characterizing its claims as "challeng[ing] the [mortgage-backed securities], not the underlying mortgage transactions."  (SPA 6.)  "Edge Act jurisdiction only requires that the case arise from transactions 'involving' territorial or foreign banking," the court explained, and "the presence of the territorial mortgages" met "that requirement."  (*Id*.)  The court found that AIG's claims "directly implicate the mortgage transactions," since they "challenge the quality and value of the [mortgage-backed securities]," which turn on the underwriting process for the individual mortgages.  (*Id.*)  The court concluded that the territorial mortgage transactions constituted "banking" because "lending on a property in a jurisdiction constitutes banking there."  (SPA 7.)

The district court also rejected AIG's attempts to narrow Section 632.  First, AIG "fail[ed] to point the Court to any recognized *de minimis* exception to Edge Act jurisdiction," and the case law indicated "that Edge Act jurisdiction lies even if the foreign or territorial transactions comprise only a 'small portion' of the challenged transactions."  (SPA 7.)  Second, the court declined to "drive a wedge

between the Edge Act's two-fold requirement of a national bank and a foreign transaction," and require the national bank to be a party to the transaction.  (*Id.*)  The Edge Act, the court explained, does not "require[] a perfect match between the particular entity involved in the territorial transaction and the party against whom the claim is brought."  (SPA 8.)  "In any event," the court found, BANA was named as a successor defendant "with respect to the territorial loans in Guam and the Virgin Islands."  (*Id.*)

In its motion for reconsideration, AIG argued that this Court's decision in *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786 (2d Cir. 1980) ("*CVF*"), required the federally-chartered bank to be involved in the jurisdictional banking transaction.  (CR 46 at 2-3.)  AIG maintained further that the court's Order was in tension with other district court decisions on the scope of the Edge Act.  (*Id.* at 11.)

The district court denied reconsideration on December 20, 2011.  The *CVF* decision, the court explained, did not "read [a national bank] 'involvement' requirement into §632."  (SPA 12.)  Rather, it was sufficient for Edge Act purposes that AIG "clearly view[s] [BANA] as potentially liable for damages" and had sued BANA as a successor to Countrywide entities, which were involved in two of the mortgage-backed securities containing territorial loans.  (SPA 12-13.)  The court acknowledged that there was some disagreement in the Edge Act case law (SPA

13), but determined that its ruling was "not inconsistent" with the authorities cited by AIG (SPA 14). The court thus "'satisf[ied] itself that the suit arises out of an international or foreign transaction which falls within the realm of those characterized as traditional banking activities.'" (*Id.* (quoting *Bank of New York v. Bank of America*, 861 F. Supp. 225, 232 (S.D.N.Y. 1994).)[3]

## SUMMARY OF ARGUMENT

1.   The district court properly exercised removal jurisdiction under the Edge Act.

a.   The only Section 632 element in dispute here is the requirement that the suit must "aris[e] out of transactions involving" foreign or territorial banking. Under a straightforward reading, this requirement is satisfied where the

---

[3] As an alternative to the Edge Act, Defendants invoked jurisdiction under 28 U.S.C. §§ 1334(b) and 1452(a), on the ground that AIG's claims were "related to" bankruptcy proceedings instituted by sponsors or loan originators involved in the challenged securities. (JA 280-86.) In its October 20, 2011 Order, the court "decline[d] to address whether jurisdiction is also proper under the 'related to' [bankruptcy] doctrine." (SPA 8 n.1.) In denying reconsideration, however, the court addressed the bankruptcy ground, finding that several pending bankruptcy proceedings provided "a sufficient basis for 'related to' jurisdiction." (SPA 17.) AIG incorrectly asserts that the court "made clear that the existence of 'related to' jurisdiction would almost certainly not suffice to *keep* this action in federal court." (AOB 19.) The court declined to decide the equitable remand issue (SPA 22), and recently stressed that it had "refrained from making any conclusions of law with respect to the equitable abstention issue given that it had already decided that jurisdiction was proper under the Edge Act" (CR 87 at 2).

plaintiff's action flows from business dealings with a connection or relationship to territorial banking.

        b.     This transaction element is satisfied because AIG's suit arises out of individual mortgage loan transactions, including loans on properties in U.S. territories such as the Virgin Islands and Guam. This is evident not only in the structure of the mortgage-backed securities AIG challenges, but also in AIG's contentions that the purported misrepresentations focused on, and AIG's claimed injuries result from, individual mortgage transactions.

        c.     The district court's straightforward statutory construction of Section 632 is supported by the limited case law interpreting the Edge Act, including this Court's decision in *CVF*.

    2.     AIG's efforts to defeat jurisdiction would require this Court to ignore the Complaint and to alter fundamentally the text of Section 632.

        a.     AIG argues that its suit "aris[es] out of" the mortgage-backed securities it bought, and not the individual mortgage loans comprising those securities. It asks the Court to treat the loans as "antecedent" to, and "earlier-in-time" from, the securities. (AOB 31, 21.) But mortgage-backed securities contemplate, and depend upon, the *ongoing* performance of individual mortgage transactions for the "principal and interest payments" that AIG allegedly lost. (Compl. ¶ 376; JA 207.) And, according to the Complaint, it is the characteristics

- 17 -

and underwriting history of these individual loans that demonstrate Defendants'
supposed fraud.

      b.    AIG's attempts to narrow Section 632 ignore its text and violate
fundamental canons of construction.  While AIG would prefer a statute requiring a
plaintiff to allege "a direct injury" from territorial banking, that is not what
Congress enacted.  Instead, it established an inclusive, transaction-based grant of
jurisdiction, consistent with the Edge Act's general purpose of creating "a federal
forum for disputes in which national banks are involved in international or foreign
transactions."  Steven M. Davidoff, *Section 632: An Expanded Basis of Federal
Jurisdiction for National Banks*, 123 BANKING L.J. 687, 690 (2006).

      c.    AIG warns that a broad interpretation of Section 632's "arising
out of" test for subject matter jurisdiction could inform the way courts apply the
judicially-created test for personal jurisdiction.  But this concern is overwrought, as
there is no proper basis for courts to engage in the apples-to-oranges comparison
AIG proposes.  In any event, hypothetical effects on unrelated areas of the law are
not germane to the proper construction of Section 632.

    3.    The district court properly rejected AIG's alternative theory that
Section 632 requires the federally-chartered party to be directly involved in the
transaction conferring jurisdiction.  Even AIG recognizes that Section 632's party
and transaction elements are separate, and that the party element is satisfied here.

- 18 -

AIG asks the Court to graft a party requirement onto the statute's "transactions involving" language, but points to no textual basis, legislative history, or reasoned decision supporting this rewrite.

4.    This Court should also reject AIG's invitation to create a new exception for cases involving "*de minimis*" territorial or foreign transactions.  Even if it were open to this Court to redefine and limit Congress's jurisdictional grant— and it is not—the proposed exception would sow confusion and uncertainty in an area where clear lines are critical.

## ARGUMENT

## I.    The District Court Correctly Held that it Had Removal Jurisdiction Under the Edge Act

The district court had removal jurisdiction under the plain terms of the Edge Act because AIG's lawsuit arises out of individual mortgage transactions, including transactions in U.S. territories.  While AIG attempts to recast its claims and import narrowing requirements into Section 632, these efforts cannot avoid the statute's straightforward application and the court's "virtually unflagging obligation … to exercise the jurisdiction given [it]."  *Colorado River*, 424 U.S. at 817.

### A.    Section 632 Confers Subject Matter Jurisdiction Because AIG's Suit Arises Out of Territorial Banking Transactions

In Section 632, Congress created a broad grant of federal subject matter jurisdiction over "all suits of a civil nature at common law or in equity to which

- 19 -

any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States."  12 U.S.C. § 632.

As AIG acknowledges (AOB 24-25), Section 632 establishes three—and only three—elements for Edge Act jurisdiction.  First, the suit must be a "civil action."  *Lemgruber*, 385 F. Supp. 2d at 213.  Second, "a corporation organized under the laws of the United States" must be a party.  *Id.*  Third, the suit must "arise[] out of transactions involving international or foreign banking or other financial operations," or "banking in a dependency or insular possession of the United States."  *Id.*; 12 U.S.C. § 632.

The first two elements are not in dispute.  This is a civil suit, with AIG asserting federal securities claims and state common-law causes of action.  And the Complaint names as a defendant BANA, a national bank organized under federal law.  *See Lemgruber*, 385 F. Supp. 2d at 213-14 (BANA's presence satisfied Section 632's party element).  The sole issue in dispute is whether AIG's lawsuit "aris[es] out of" transactions involving banking "in a dependency or insular possession."  The district court correctly held that this element was readily satisfied here.  AIG's theories of fraud and causation all turn on the individual mortgage loans comprising the challenged securities—including mortgage loans on properties in U.S. territories.

### 1.    Section 632 is Met if Any Part of the Challenged Transaction Was Connected to Territorial Banking

"It is axiomatic that the plain meaning of a statute controls its interpretation."  *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999).  Here, Congress used not one, but *three* expansive phrases to define Edge Act jurisdiction under Section 632.  The provision covers lawsuits "[1] arising out of [2] transactions [3] involving" foreign or territorial banking.

The phrase "arising out of" is "notoriously" broad.  *Burgos*, 432 F.3d at 50 (construing Section 632).  It is "ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from,' or in short, 'incident to, or having connection with.'"  *Hamilton v. United Healthcare of Louisiana, Inc.*, 310 F.3d 385, 391 (5th Cir. 2002) (alterations omitted); *accord Hernandez Perez v. Citibank, N.A.*, 328 F. Supp. 2d 1374, 1378 (S.D. Fla. 2004) (construing Section 632).  *Cf. Guccione v. United States*, 847 F.2d 1031, 1036 (2d Cir. 1988) ("the 'arising out of' language is broad and must not be circumvented by techniques of artful pleading"); *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 236 (4th Cir. 2012) (Wilkinson, J., dissenting) (the phrase "arising out of" is "among the broadest in the law").  As the Supreme Court observed in construing a similarly worded statute, the words "arising out of" exclude only those claims or injuries that are "thoroughly disconnected" from the activity at issue.  *O'Keeffe v. Smith, Hinchman*

*& Grylls Assocs., Inc.*, 380 U.S. 359, 362 (1965) (construing Longshoremen's and Harbor Workers' Compensation Act).

Second, the universe of eligible lawsuits includes any with a connection to the specified "transactions"—a "term that courts have recognized as having a broad meaning." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011); *see also Bass v. Stolper, Koritzinsky, Brewster & Neider*, 111 F.3d 1322, 1325 (7th Cir. 1997) ("[t]he ordinary meaning of the term 'transaction' is a broad reference to many different types of business dealings between parties").

Third, in using the term "involving" to define when banking-related transactions may trigger jurisdiction, Congress again chose "an exceedingly broad term for a statute." *United States v. Vickers*, 540 F.3d 356, 365 (5th Cir. 2008).  In ordinary parlance, the phrase "transactions *involving* [foreign or territorial banking]" reaches any business dealings that "have an effect on" or "have within or as part of" them foreign or territorial banking.  *See* Webster's Third New Int'l Dict. 1191 (2002).

When this language is read together and in context, Congress's purpose and intent becomes clear:  Section 632 grants federal courts original and removal jurisdiction over cases flowing from transactions having a connection to foreign or territorial banking.  Consistent with this plain meaning, "federal courts in this Circuit have consistently interpreted the Edge Act's jurisdictional provision

broadly." *Lemgruber*, 385 F. Supp. 2d at 214; *see also* Davidoff, *supra*, at 690

("The majority of federal courts, in keeping with the words of the statute itself,

have read Section 632 as providing a broad basis for federal jurisdiction.").  They

have held, in particular, that Section 632 confers jurisdiction over a suit where

"any part of it" arises out of transactions involving international or territorial

banking, *In re Lloyd's Am. Trust Fund Litig.*, 928 F. Supp. 333, 338 (S.D.N.Y.

1996), even if the international or territorial activity "was not central to the case,"

*id.* at 340 (collecting cases), or represented only "a small portion" of the

transactions at issue in the suit, *Pinto v. Bank One Corp.*, 2003 WL 21297300, at

*3 (S.D.N.Y. June 4, 2003).

> ## 2.     AIG's Claims and Allegations Establish that its Suit Arises Out of Transactions Involving Territorial Banking

This action falls squarely within Section 632's jurisdictional grant, for AIG's

own Complaint and opening brief establish that its suit "aris[es] out of"

transactions involving banking in U.S. territories.  AIG concedes that it challenges

mortgage-backed securities that include more than two dozen mortgage loans on

properties in Puerto Rico, Guam, the Northern Mariana Islands, and the U.S.

Virgin Islands.  (*See* AOB 9-10.)  And AIG's own preferred authority confirms

that transactions involving mortgages on properties within United States territories

constitute "banking in a dependency or insular possession" for purposes of Section

632.  *Chase Manhattan Bank (N.A.) v. Corporacion Hotelera de Puerto Rico*, 516

F.2d 1047, 1048-49 & n.1 (1st Cir. 1975) (foreclosure on mortgage of tourist hotel in Puerto Rico) (cited at AOB 27); *Conjugal Society Composed of Juvenal Rosa v. Chicago Title Insurance Co.*, 690 F.2d 1, 4 (1st Cir. 1982) ("Banking activities covered by section 632 include mortgage agreements ….") (cited at AOB 28). These authorities are consistent with the federal regulations enforcing the Edge Act, which include "mortgage banking" among the activities "usual in connection with the transaction of banking or other financial operations abroad."  12 C.F.R. § 211.10(a)(2).

AIG's allegations establish a direct factual nexus between its claims and the territorial mortgages conferring Edge Act jurisdiction.  The individual mortgage transactions, including the territorial mortgages, drive the merits of AIG's action in three critical respects:

*First, the mortgages are built into the mortgage-backed securities that AIG challenges*.  This is crystal clear from AIG's account of how the securities work and from the face of the offering documents.[4]  Mortgage-backed securities are typically titled "mortgage *pass-through* certificates" because they give their owner the right to receive an income stream from a pool of individual mortgages.  (*E.g.*,

---

[4] AIG does not reprise its argument, rejected by the trial court, that the well-pleaded complaint rule requires remand because AIG's Complaint contains no allegations concerning territorial mortgages.  Regardless, the offering documents are properly considered under that rule, since the Complaint references them.  *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

JA 342 (emphasis added).)  As individual "borrowers make payments" on their loans, "that cash flow is '*passed through*' to the certificate holders based on their share of the pool" and the priority of their tranche.  (Compl. ¶ 79; JA 87 (emphasis added).)  And AIG was squarely on notice here that the mortgage payments passed through to it included mortgages on territorial properties, as the relevant offering documents expressly said so.  (*Supra* at 12.)

The value of the mortgage-backed securities turns on the performance and value of the individual mortgages.  The Complaint itself characterizes this connection as "direct":  "Because the cash flow from the loans in the collateral pool of a securitization is the source of payments to holders of the securities issued by the trust, the credit quality of the securities depends *directly* upon the credit quality of the loans in the collateral pool."  (Compl. ¶ 84; JA 88 (emphasis added).)  Courts likewise have noted that "[t]he value of such securities depends ... on the cash flow generated by the mortgages and the prospects that the principal and interest will be paid."  *Huffington v. T.C. Group, LLC*, 637 F.3d 18, 20 (1st Cir. 2011).

*Second, AIG's misrepresentation theories are directly tied to the characteristics and performance of individual mortgages*.  The gravamen of the Complaint is that Defendants' mortgage underwriting process "encouraged borrowers to falsify loan applications, pressured property appraisers to inflate

- 25 -

home values, and ignored obvious red flags in the [loan] underwriting process."
(Compl. ¶ 3; JA 63.)  AIG alleges that Defendants were involved in, or knew
about, these flawed underwriting practices, and yet made misrepresentations about
them and the resulting mortgages.  (*Id.*)  Specifically, AIG alleges that Defendants
misrepresented the underwriting standards used to "assess each borrower's ability
to pay and the market value of the underlying properties" (Compl. ¶ 10; JA 67),
and the characteristics of the loans, such as aggregate figures regarding loan-to-
value ratios and owner occupancy status (Compl. ¶¶ 106; JA 96).

There is yet more.  The alleged falsity of these representations rests on
"*individual* loan-level data" about how the mortgages were actually underwritten,
the value of the purchased homes, and the borrowers' qualifications.  (Compl.
¶ 132; JA 110 (emphasis added); *see also* Compl. ¶¶ 133-69; JA 109-25.)  The
underwriting representations are alleged to be false because "[i]n their roles as both
originators and as acquirers of the loans, Defendants ignored borrowers' actual
repayment ability and the value and adequacy of mortgaged property[.]"  (Compl.
¶ 169; JA 125.)  The loan characteristic figures are alleged to be false in light of
the "actual [loan-to-value] ratio[s]" for particular loans and properties, and whether
"a given borrower actually occupied the property."  (Compl. ¶¶ 133, 147; JA 110,
117.)  The point is underscored by AIG's allegations about specific instances
where Defendants purportedly "diverged" from the offering documents' stated

guidelines, producing mortgage loans with sub-standard loan-to-value ratios. (Compl. ¶¶ 280, 334; JA 165-66, 189-90.)

*Third, AIG's theory of causation and injury runs directly to the individual mortgages and their attendant underwriting histories.* AIG avers that it "relied upon Defendants' representations and assurances regarding the quality of the mortgage collateral underlying the certificates, including the quality of the underlying processes." (Compl. ¶ 366; JA 203.) AIG specifically alleges that the "losses in principal and interest payments [from the challenged securities] are a *direct result* of the poor quality of the collateral underlying the certificates and the high rates of default and delinquency of the mortgage loans." (Compl. ¶ 376; JA 207 (emphasis added).) It is purportedly because "the loans backing the certificates were made to borrowers who did not have the represented ability or propensity to repay, and on properties that were overvalued" that AIG claims it suffered financial injury. (Compl. ¶ 371; JA 205.)

### 3. The Nexus Between AIG's Claims and the Individual Mortgages is More than Sufficient for Edge Act Jurisdiction

Given these undisputed connections, the district court was correct in concluding that AIG's "claims directly implicate[d] the mortgage transactions," and that this established jurisdiction under the limited Edge Act case law. (SPA 5-8, 12-13.)

There is, as AIG concedes, no decision applying Section 632 "in the specific context of *securitization* of mortgage loans." (AOB 33.) But a straightforward application of the statutory text to AIG's claims shows that the mortgage loan transactions are more than enough for Edge Act jurisdiction. These transactions, which include territorial loans, go to the heart of AIG's action, and courts "'routinely appl[y] Section 632, even in cases ... containing only an incidental connection to banking law,' and 'even though the international or foreign banking activity was not central to the case.'" *Lemgruber*, 385 F. Supp. 2d at 214 (quoting *In re Lloyd's*, 928 F. Supp. at 340).

This Court's sole decision exploring the scope of Section 632, *CVF*, 629 F.2d 786, supports removal jurisdiction here. That case confirmed the Edge Act's broad reach, upholding "jurisdiction under Section 632 even though the international or foreign banking activity was not central to the case." *In re Lloyd's*, 928 F. Supp. at 340 (construing *CVF* and other cases). *See generally* Robert M. Brill & James J. Bjorkman, *Federal Court Jurisdiction Over International Banking Transactions*, 110 BANKING L.J. 118, 124-26 (1993) (describing *CVF* as adopting an "expansive interpretation" of Section 632).

*CVF* concerned a Venezuelan government entity's guarantee of notes issued by a Venezuelan corporation (Cariven). The notes were purchased by a Swiss corporation (Merban) and resold to several banks. The government entity (CVF)

sought a declaratory judgment against Cariven and Merban nullifying its guarantees on the ground that Cariven had not complied with certain required conditions, and the purchasing banks intervened.  629 F.2d at 789.  After the district court held the guarantees enforceable, CVF unsuccessfully sought dismissal on the ground that there was no federal jurisdiction.  477 F. Supp. 615, 616-17 (S.D.N.Y. 1979).

On review, this Court first held that the sale of Cariven's notes could *not* support Edge Act jurisdiction, because that sale—unlike the mortgage transactions at issue in this case—was "not really a banking transaction."  629 F.2d at 792.  Instead, the Court held that there was Edge Act jurisdiction in *CVF* based on a transaction that was only tangentially related to the dispute adjudicated by the district court.  Cariven had issued the notes in controversy as a means of financing the purchase of two cruise ships, and a national bank, SPIB, had provided a letter of credit on Cariven's account for the benefit of the seller of the ships, a New York corporation.  *Id.*  SPIB was initially named in CVF's complaint for wrongfully allowing drawdowns, in New York, against the letter of credit by the New York corporation.  This Court held that there was Edge Act jurisdiction as a result of the drawdown transactions—even though SPIB had been dismissed from the action by stipulation of the parties well before trial, *see* 477 F. Supp. at 617, 621, even though the drawdown transactions took place entirely within the United States,

- 29 -

between two U.S. corporations, and even though the drawdowns had no bearing on the core dispute before the court (*i.e.*, the enforceability of CVF's guarantees).

Under *CVF*, then, the "arising out of" requirement can be satisfied by a transaction that took place exclusively in the United States, and was only loosely related to the live dispute between the parties, because it had *some* connection to foreign banking. That standard is plainly met by AIG's claims here, which posit a direct nexus between the challenged transaction and territorial banking.

## B. AIG's Jurisdictional Challenge Belies its Own Allegations and Fundamentally Misconstrues Section 632

Faced with the plain, and plainly broad, text of Section 632, AIG resorts to a series of redrafting exercises. AIG first reads new language into the statute, arguing that the plaintiff must claim "injury *directly* from" foreign or territorial banking. (AOB 26-28.) It then proceeds to recharacterize the allegations in its Complaint in an effort to show that its claims are not "directly" related to individual mortgage transactions. According to AIG's newfound understanding of mortgage-backed securities, the individual mortgages involve only isolated "episode[s] of territorial banking" that are separate from and "antecedent" to the creation of mortgage-backed securities. (*Id.* at 28, 31.)

These efforts must fail. To begin with, the question whether Section 632 contains a "direct injury" requirement is purely academic here, because AIG has pled its way into Edge Act jurisdiction even under that standard. While AIG

- 30 -

attempts on appeal to draw an artificial distinction between mortgage-backed securities and individual mortgage loans, the allegations in its Complaint show that AIG's claims *do* "directly implicate the mortgage transactions," as the district court found.  (SPA 6.)  But even if AIG could somehow walk away from the factual allegations and legal theories it pled, there is no legitimate source of statutory meaning—no text, no case law, and no legislative history—that would permit the Court to graft a "direct injury" requirement onto Section 632.  Nor can AIG justify its proposed redraft with foreboding about the district court's "radical[] expan[sion]" of "specific personal jurisdiction" (AOB 36); that threat is both irrelevant (as a basis for construing a statute) and misplaced (as a prediction of what courts would do).

### 1.    AIG's Complaint Forecloses its Effort to Break Apart Mortgage-Backed Securities From Individual Mortgages

The refrain in AIG's Opening Brief is that the securitized mortgage transactions end where the securitization process begins.  AIG maintains that individual mortgages, including the "territorial/international banking transaction[s]," are merely "antecedent" to, and "earlier-in-time" than, the creation of mortgage-backed securities.  (AOB 21, 31.)  As the district court recognized (SPA 6), AIG's own allegations and the offering documents it challenges both refute this argument.  They show that individual mortgages are the lifeblood of mortgage pass-through certificates, and go to the core of AIG's claims:

*The Structure of Mortgage-Backed Securities*.  These securities entail, and depend upon, an ongoing relationship between the security trusts and the individual mortgage loan transactions.  Because the monthly "cash flow from the loans … is the source of payments to holders of the securities issued by the trust" (Compl. ¶ 84; JA 88), the certificates purchased by AIG contemplate that individual borrowers will continue to make payments on their loans long after the certificates are sold.  That is why AIG contends it has been damaged by, among other things, delinquencies and defaults on individual mortgage loans that occurred *after the corresponding securities were sold to AIG*.  (*See, e.g.*, Compl. ¶¶ 336; JA 191-92 (listing specific number of "delinquent or defaulted loans" in the "months since issuance" of six mortgage-backed securities at issue); Compl. ¶ 372; JA 205 (alleging that "the performance and value of the certificates plummeted" after the mortgage loans "experienced unprecedented rates of delinquency, default and foreclosure").)

Indeed, AIG's characterization of mortgage loans as one-off, "antecedent" transactions cannot be squared with how they actually work.  Although there are many different types of mortgage loans for residential property, they typically require the borrower to make monthly principal and interest payments over a number of years.  *See* JOSEPH HU, BASICS OF MORTGAGE-BACKED SECURITIES 1-8 (2d ed. 2001).  If the borrower "defaults on his loan payments" during the life of

the loan, "the lender has the ability to force the property to be sold and to use the proceeds of the sale to pay off the rest of the note."  JOSEPH W. SINGER, PROPERTY LAW 921 (3d ed. 2002).  The transaction thus contemplates an ongoing relationship between borrower and lender over many years.

The point of mortgage pass-through certificates is to collect thousands of individual mortgage *obligations*, and to draw on the ongoing payments of individual borrowers to create revenue streams with varying risk.  These rights and risks are then passed along to the certificate holders.  To the extent that there are "[a]ny losses on the underlying loans—whether due to default or otherwise—[the losses] are generally applied in reverse order of seniority" between the different "tranches."  (Compl. ¶ 81; JA 88.)  If any securitized mortgage loans go into default and foreclosure, the lender will "liquidate the house," HU, *supra*, at 35, and any "recovered principal is passed on to investors" in the mortgage-backed security, FRANK J. FABOZZI ET AL., MORTGAGE-BACKED SECURITIES 90 (2007).  That the mortgage-backed securities were created and issued after the individual mortgages were first executed (AOB 28) is irrelevant.  The financial structure and quality of mortgage pass-through certificates cannot be divorced from the loans that comprise them.

*AIG's Misrepresentation and Causation Contentions*.  Even if individual mortgage transactions could fairly be characterized as "antecedent" to the

- 33 -

mortgaged-backed securities, AIG's claims rest on their close relationship.  As the district court recognized (SPA 6), AIG's theories of misrepresentation, injury, and causation all turn on its allegations about the underwriting process for individual mortgages and the characteristics of those loans.  (*See supra* at 23-27.)  AIG alleges that Defendants' representations were false because, at an individual loan level, Defendants departed from underwriting standards, the purchased property was overvalued, the owner did not actually live at the residence, and other represented characteristics were purportedly false.  It alleges that the certificates lost their value because "the borrower[s] could not pay the loans and the inflated property values could not support principal repayments in foreclosure."  (Compl. ¶ 372; JA 205.)  These allegations are essential to AIG's suit, for they are necessary to satisfy the falsity element required for each of AIG's claims, and the reliance and causation elements of their state-law misrepresentation claims.  (*See generally* Compl. ¶¶ 461-518; JA 234-46.)

AIG now says it "does *not* claim direct injury from any of the thousands of mortgage loan transactions" comprising the challenged securities.  (AOB 28.)  But this squarely contradicts AIG's allegation that its "substantial losses in principal and interest payments are a *direct result*" of the "default and delinquency of the mortgage loans" underlying the securities.  (Compl. ¶ 376; JA 207 (emphasis added).)  It is AIG's Complaint—and not AIG's recharacterization of those

allegations in its appellate brief—that controls in resolving the jurisdictional dispute here. *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (a party cannot amend its complaint through motions or briefs). The Complaint's allegations confirm that AIG's theory of causation runs to the individual mortgage loans and the way they purportedly have performed.

Indeed, some of AIG's claims involving territorial mortgages rest *solely* on Defendants' conduct at the *origination* stage—*i.e.*, their conduct in underwriting individual mortgages. For example, for three of the securities backed in part by territorial mortgages, AIG sued two Defendants based only on their role as an originator: Countrywide Home Loans, Inc. (with respect to GSR 2006-1F and BAFC 2007-A) and Merrill Lynch Credit Corporation (with respect to SEMT 2007-3). (*See* AOB 9-10; JA 317-18, 452.) The asserted basis for the originator Defendants' liability on these securities relates to their involvement in initiating the individual mortgage loans backing the securities—and *not* to the depositing, underwriting, or sale of the mortgage-backed securities ultimately purchased by AIG.

If, as AIG now insists, the individual mortgage loans were separable from the challenged mortgage-backed securities, the Complaint and the forthcoming litigation would have focused solely on mortgage pools. (AOB 28.) And yet AIG repeatedly stresses the significance of the "individual loan-level data" and "loan-

by-loan metrics" allegedly possessed by Defendants (*e.g.*, Compl. ¶¶ 132; JA 110), and claims to have uncovered the alleged misrepresentations by undertaking a "loan-level" analysis of certain mortgages (*e.g.*, Compl. ¶ 126; JA 107-08; *see also* Compl. ¶¶ 129, 141, 147-51; JA 107-09, 114-15, 117-18). AIG even complains that it "has been unable to access loan files" for individual mortgage loans, and that it requires "a review of the complete loan files in discovery" in order to prosecute its claims. (Compl. ¶¶ 369, 7: JA 204, 65.) These loan files include documents specific to each individual borrower and mortgaged property, such as the loan application, references and credit reports for the borrower, and the appraisal of the property. (Compl ¶ 84; JA 88.)

Given AIG's stated belief that "[t]he most important information about the credit quality of the loans is contained in the 'loan files'" (*id.*), and that its suit can be adjudicated only by "scrutiniz[ing]" documents specific to each of those mortgage loans (Compl. ¶ 7; JA 65), AIG cannot plausibly contend that its suit does not arise out of the mortgage loans backing its securities (AOB 26). Rather, AIG's own allegations establish a close nexus between its suit and the specifics of individual mortgage loans, including those on properties in U.S. territories.

### 2. AIG's Narrowing Construction of Section 632's "Arising Out Of" Language is Countertextual and Contrary to the Statute's Purpose

Even if AIG's factual allegations treated individual mortgages as merely "antecedent" transactions, and not the source of AIG's "direct injury" (*cf.* AOB 28, 31), AIG's claims would still "aris[e] out of transactions involving" territorial banking. That is because there is no basis to qualify the phrases "arising out of" and "involving" with a "direct injury" requirement. (*See* AOB 26-31.)

AIG's aim in proposing these constructions is apparent: it seeks to artificially tighten the nexus required between the plaintiff's suit and the relevant foreign banking activity. But whether the "direct" requirement is inserted into the "arising out of" phrase (thereby narrowing the scope of relevant claims) or the "transactions involving" phrase (thereby narrowing the scope of foreign or territorial banking activities), the effect would be to rewrite the statute and defeat Congress's design. Controlling principles of statutory construction foreclose such a result.

As noted, Congress used expansive terms to define both the universe of potentially relevant claims ("arising out of") and the universe of banking-related subject matter ("transactions involving" foreign or territorial banking) within Edge Act jurisdiction. (*See supra* at 21-23.) Where, as here, Congress has adopted a facially "generous" removal provision, the "general rule of construing removal

statutes strictly against removal cannot apply." *Acosta v. Master Maintenance & Constr. Inc.*, 452 F.3d 373, 377 (5th Cir. 2006) (applying the Convention on the Recognition and Enforcement of Foreign Arbitral Awards) (citation omitted). Nor can any general rule of construction for removal statutes (AOB 24) support "an artificial construction" of Section 632 "that is narrower than what the text provides." *Exxon Mobil*, 545 U.S. at 558; *see also Bosky v. Kroger Texas, LP*, 288 F.3d 208, 211 (5th Cir. 2002) (the principle of construing removal statutes strictly "does not trump a plain language reading of the statute's terms"). Because "Congress created special removal rights to channel cases into federal court," *cf. Acosta*, 452 F.3d at 377, "the Court's only role is to enforce that language according to its terms." *Jana Master Fund, Ltd. v. JP Morgan Chase & Co.*, 490 F. Supp. 2d 325, 328-29 (S.D.N.Y. 2007) (quoting *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 236 (2d Cir. 2006)).

AIG's essential position is that Section 632 *should* have been drafted narrowly to embrace only lawsuits challenging foreign banking transactions to which the plaintiff was a direct party and from which it claims "direct" injury. (AOB 28.) Only then, in AIG's view, is the connection between the transaction and the lawsuit sufficient to permit removal or original jurisdiction. (*See id.*) But this construction would insert words into Section 632's broad language. Even if there were good policy reasons to narrow Edge Act jurisdiction—and Congress

saw none—the courts are not at liberty to "rewrit[e] rules that Congress has affirmatively and specifically enacted." *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978); *see also United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723, 1730-31 (2011) ("[C]onsiderations of policy divorced from the statute's text and purpose could not override its meaning.").

AIG's approach is particularly inappropriate because it would undermine Congress's general concern, reflected in the original Edge Act and its amendments, with international banking transactions. While the legislative history for Section 632 is limited, *see A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1462 (D.C. Cir. 1995), Congress's general objectives in enacting and amending the Edge Act align with its decision to confer broad subject matter jurisdiction in Section 632.

Congress enacted the Edge Act following World War I in an effort "to increase the stability of, and the public's confidence in, international markets." *Id.* Among other things, the Act established federally-chartered financial institutions, which were later subject to extensive federal regulation. *Id.* at 1462-63. A decade later, following the 1929 stock market crash, Congress incorporated Section 632 into the Edge Act as part of the Banking Act of 1933 (the Glass-Steagall Act). *See Samsun Logix Corp. v. Bank of China*, 740 F. Supp. 2d 484, 491 (S.D.N.Y. 2010). That statute implemented a "comprehensive overhaul of the national banking

system." *Id.* Congress's chief concerns, stemming from its investigations into the causes of the 1929 crash, included the involvement of the Federal Reserve Bank and national banks in risky foreign investments and loans. *See, e.g.*, S. Rep. No. 584, at 4-5, 11 (1932) (noting problems associated with banks issuing "acceptance" loans to foreign governments, and Federal Reserve Banks "attempt[ing] to carry out plans and measures of a hazardous nature" with foreign banks). One of the law's sponsors, Senator Glass, explained that the "great banks" had promoted "the investment securities of tottering South American republics and other foreign countries," and that the Federal Reserve Banks had "apparently given more attention to 'stabilizing' Europe and to making enormous loans to European institutions" than to supporting domestic commerce. 75 Cong. Rec. 9883-84 (1932).

In addition to imposing new requirements on the investment and foreign activities of national banks and the Federal Reserve Banks, Congress gave the federal courts broad jurisdiction over lawsuits involving these institutions and foreign banking. In doing so, Congress ensured "a more uniform and predictable system of dispute resolution within the federal courts." *New Mexico ex rel. Foy v. Vanderbilt Capital Advisors, LLC*, 2009 WL 3672921, at *2 (D.N.M. Apr. 13, 2009). In this respect, Section 632's jurisdictional grant complements Congress's

objective of establishing a "uniform national regulatory apparatus." *Id.* AIG's construction cannot be squared with this purpose.

### 3. AIG's Narrowing Construction is Unsupported by Case Law Construing Section 632

Lacking any textual support for its cramped interpretation, AIG attempts to tease it out of the language and facts of the limited Edge Act case law. But AIG's survey is no substitute for a first-principles statutory construction, and cannot avoid the plain breadth of the statute or its evident application to AIG's claims.

The majority of cases have applied Section 632's broad text as written, and the handful of cases cited by AIG for a narrower interpretation of the statute "represent the minority view which has been criticized." *Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.*, 627 F. Supp. 2d 730, 736 (N.D. Tex. 2008) (collecting cases). For example, in one of the outlier cases AIG cites, *Bank of New York v. Bank of America*, 861 F. Supp. 225 (S.D.N.Y. 1994), the district court held that Edge Act jurisdiction was lacking because the case "present[ed] no banking law issues" and the claims were not "integrally tied to banking activity." *Id.* at 232-33. That decision, however, has been roundly criticized as "inconsistent with the text of Section 632." [5] *In re Lloyd's*, 928 F. Supp. at 340. Even the court in *Bank of New York* recognized as much, noting that

---

[5] AIG has rightly abandoned its reliance on this countertextual "integrally tied to banking activity" standard, which it advanced in the district court. (CR 23 at 8.)

"[o]n its face, the statute only requires that a case arise out of a transaction involving foreign banking." 861 F. Supp. at 233. In all events, even the heightened and countertextual requirements set forth by the *Bank of New York* court would be satisfied here, where mortgage loan transactions are indisputably a banking activity, and AIG's claims are integrally tied to that activity. (*See supra* at 23-27.)

The real point is that "[t]he issue" of Section 632's application to AIG's lawsuit "is too fact-bound, and the cited cases too remote factually from the present case, for [the Court] to be able to derive much guidance from them." *Illinois Power Co. v. CIR*, 792 F.2d 683, 685 (7th Cir. 1986) (Posner, J.). In attempting to stretch prior cases to fit its theory, AIG must either distort them or draw broad-based principles from holdings grounded in the particulars of the transactions at issue—transactions fundamentally different from mortgage-backed securities.

AIG is simply wrong, for example, when it characterizes *CVF* as holding that a "transaction does not 'involve' banking simply because it bears some connection to an antecedent territorial/international banking transaction." (AOB 31.) This reading rests on the premise that the *CVF* Court "did *not* view" the principal transaction, the sale of the notes from Cariven to Merban, as a "transaction 'involving' banking based on the fact that a [national] bank, SPIB, had

played a pivotal role in an *earlier* episode of banking activity:  the provision 'of a letter of credit for Vintero's benefit on Cariven's account.'"  (AOB 30 (emphasis in original).)  This premise is wrong, however, because SPIB issued the letter of credit *after* the sale of the notes.  *See* 629 F.2d at 789; Complaint at ¶¶ 11, 13, *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, No. 76-cv-1671 (S.D.N.Y. 1976) (letter of credit opened after notes were delivered to Merban).  As discussed above, the *CVF* Court deemed the sale of notes insufficient for Section 632 jurisdiction because it concluded that transaction *did not constitute banking at all*.  (*Supra* at 29.)  What is significant about the letter of credit transaction is not its timing, but the fact that it was deemed sufficient to confer Edge Act jurisdiction even though it was both predominantly domestic and distinct from the principal transaction in dispute.

None of the other cases AIG cites focuses on whether a "transaction involving" foreign or territorial banking was "antecedent."  The lawsuits in *Sollitt v. Keycorp*, 463 F. App'x 471, 2012 WL 284389 (6th Cir. 2012), and *Diaz v. Pan American Federal Savings & Loan Association*, 635 F.2d 30 (1st Cir. 1980), did not even arise out of "transactions involving" foreign or territorial banking; they arose from non-transactional conduct with only an incidental relationship to banking.  *Solitt* centered on a wrongful termination action arising out of the plaintiff employee's firing.  *See* 463 F. App'x at 472.  *Diaz* centered on a tort suit

- 43 -

arising out of the defendant's alleged malicious referral of a criminal prosecution.

635 F.2d at 31.  Banking activity came into play in *Solitt* only insofar as the

plaintiff claimed he was fired for complaining about a prior currency transaction,

and in *Diaz* only because the criminal referral was for passing bad checks.

Because the gravamen of these claims was tortious conduct that was neither

transactional nor intrinsically related to banking, the courts expressed concern that

upholding removal jurisdiction would entail a "limitless view" of Section 632,

*Solitt*, 463 F. App'x, at 473-74, which would "reach all cases in which a bank is a

party," *Diaz*, 635 F.2d at 32.  That concern is manifestly absent here.

This is not a situation where the alleged misconduct bears a "meager

association" to foreign or territorial banking, equivalent to firing someone, calling

the police, or "trip[ping] and fall[ing] over a stack of carelessly placed printout of

foreign-currency transactions."  *Solitt*, 463 F. App'x at 473; *cf. Racepoint

Partners, LLC v. JPMorgan Chase Bank*, 2006 WL 3044416 at *2-*3 (S.D.N.Y.

Oct. 26, 2006) (rejecting Edge Act jurisdiction where international transaction was

mere "evidence" that Enron indenture trustee knew of Enron's misconduct and

failed to act).  The individual mortgages giving rise to Edge Act jurisdiction here

are built into the DNA of both mortgage-backed securities and AIG's claims.

Nor can AIG's narrowing principle be found in cases that have upheld Edge

Act jurisdiction.  (AOB 27.)  That Section 632 applies to lawsuits brought by

parties to a mortgage loan or other transaction does not establish that the statute is *limited* to such situations. *See Chase Manhattan Bank*, 516 F.2d at 1049; *Burgos*, 432 F.3d at 49; *Clarken v. Citicorp Diners Club, Inc.*, 2001 WL 1263366, at *1 (N.D. Ill. Oct. 22, 2001). None of these cases even purports to look beyond the narrow circumstances presented. They thus cannot be fairly read to establish the outer limits of Section 632's jurisdictional grant. *See Juvenal Rosa*, 690 F.2d at 4 (cited at AOB 28) (upholding Section 632 jurisdiction, even though plaintiffs were not a party to the mortgage foreclosure at issue, because "Section 632 is not limited to the original two parties to a banking transaction").

### 4. The Standard Governing Specific Personal Jurisdiction Cannot be Imported into Section 632

AIG argues, for the first time on appeal, that a narrow construction of Section 632's "arising out of" language is somehow compelled by the judicially-formulated law of specific personal jurisdiction. (AOB 36-38.) The standard controlling specific personal jurisdiction is not relevant to, much less dispositive of, the question of statutory interpretation before the Court.

First, speculation about the possible implications of a particular holding cannot justify displacing the results of sound statutory interpretation. The Court's "charge is to give effect to the law Congress enacted," not to hypothesize about the "consequences of each [suggested interpretation] and adopt the one that produces the least mischief." *Lewis v. City of Chicago*, 130 S. Ct. 2191, 2200 (2010).

Neither the Supreme Court nor this Court tolerates attempts to construe a statute based upon theoretical consequences divorced from a statute's terms. *See, e.g.*, *CIR v. Lundy*, 516 U.S. 235, 252 (1996) ("'[W]e are not at liberty to rewrite the statute because we might deem its effects susceptible of improvement.'") (citation omitted); *In re Barbieri*, 199 F.3d 616, 621 (2d Cir. 1999) (similar).

Second, AIG offers no legitimate basis for construing the Edge Act by reference to the personal jurisdiction standard. AIG has identified no case importing personal jurisdiction standards into a Section 632 jurisdiction analysis (or vice versa). Neither the text of Section 632 nor its legislative history incorporates or references personal jurisdiction standards. And there is no reason to believe that Congress had the personal jurisdiction standard in mind when it drafted Section 632 in 1933; that would have been impossible, because Congress enacted the statute decades *before* the Supreme Court first enunciated the "arising out of or related to" test for specific personal jurisdiction in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984). *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2246 (2011) ("'[W]here words are employed in a statute *which had at the time* a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense.'") (emphasis added) (citation omitted). While courts generally construe statutes so that "identical words used in different parts *of the same act* are intended to have the

same meaning," *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570 (1995) (emphasis added) (internal quotation marks omitted), and may even extend this canon of interpretation to identical terms in statutes addressing the same subject matter, *see Erlenbaugh v. United States*, 409 U.S. 239, 243-44 (1972), AIG adduces no authority for the proposition upon which its argument relies: that Section 632 must be construed *in pari materia* with a subsequently adopted *judicial* standard addressing an entirely different subject matter.

Third, the differences in the formulation and purpose of the Edge Act jurisdictional test and the standard for specific personal jurisdiction would make it especially inappropriate to treat them as coextensive.  Though they share the words "arising out of," the two tests have different operative language as a whole.[6]  This is unsurprising, as the tests apply to "two jurisdictional bedrocks" that are "unquestionably differ[ent]."  *See generally Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).  Subject matter jurisdiction limitations "serve institutional interests," "keep[ing] the federal courts within the bounds the Constitution and Congress have prescribed."  *Ruhrgas*, 526 U.S. at 583.  For this reason, they are "nonwaivable."  *Id.*  In contrast, personal jurisdiction rests on the Due Process Clause and "'represents a restriction on judicial power ... as a matter of individual

---

[6] *Compare* 12 U.S.C. § 632 ("all suits … arising out of *transactions involving*"), *with Helicopteros*, 466 U.S. at 414 n.8 ("a suit arising out *of or related to the defendant's contacts with the forum*") (emphasis added).

liberty.'"  *Id.* at 584 (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)).  Because personal jurisdiction reflects flexible, "traditional notions of fair play and substantial justice," it can be consented to or waived by litigants.  *Ins. Corp. of Ireland*, 456 U.S. at 702-03.

Fourth, AIG's crocodile tears about the possibility that more defendants in mortgage-backed securities cases will be haled into courts in states across the Nation are both misplaced and irrelevant.  Plaintiffs in the bevy of mortgage-backed securities cases filed since the financial crisis have had, with few exceptions, no difficulties establishing personal jurisdiction over the named defendants.  To take just one example, cases filed by various Federal Home Loan Banks against dozens of the Nation's largest banks and financial services corporations are currently pending in courts in California, Georgia, Illinois, Indiana, Massachusetts, Pennsylvania, and Washington.[7]

---

[7] *E.g.*, *Fed. Home Loan Bank of Chicago v. Banc of America Secs. LLC et al.,* No. LC091499 (Cal. Super. Ct.); *Fed. Home Loan Bank of Atlanta v. Countrywide Fin. Corp. et al.*, No. 11EV011779G (Ga. State Ct.); *Fed. Home Loan Bank of Chicago v. Banc of America Funding Corp. et al.*, No. 10CH45033 (Ill. Cir. Ct.); *Fed. Home Loan Bank of Indianapolis v. Banc of America Mortgage Secs., Inc. et al.,* No. 49D051010PL045071 (Ind. Super. Ct.); *Fed. Home Loan Bank of Boston v. Ally Fin., Inc. et al.,* No. 11-10952 (D. Mass.); *Fed. Home Loan Bank of Pittsburgh v. J.P. Morgan Secs. Inc. et al.,* No. GD-09-016892 (Pa. C.P.); *Fed. Home Loan Bank of Seattle v. Bear, Stearns & Co., Inc. et al.,* No. 09-2-46298-4 (Wash. Super. Ct.).

Finally, even if the potential implications of Section 632's "arising out of"

language for another area of the law could somehow support a narrowing

construction, it would not change the result here.  The upshot of AIG's reading is

that the phrase "arising out of" embraces only the mortgage-backed securities AIG

challenges.  But even on that theory, AIG's suit would still "involve" individual

mortgages within the meaning of Section 632.  As noted above, the phrase

"transactions involving" is itself broad, and would clearly encompass the

individual mortgages whose payment streams pass through AIG's certificates and

whose characteristics form the substance of its claims.

### C.    Section 632 Contains No Requirement that a National Bank Must be Directly Involved in the Territorial Banking Activity

AIG's next tack is to invent yet another new requirement for Edge Act

jurisdiction:  that "a federally chartered bank named as a defendant [must] have

been involved in the territorial/international banking [transaction]."  (AOB 40.)

This supposed requirement, too, is unfaithful to the statutory text.  It improperly

conflates elements that Congress meant to be separate and independent: the

second, party-based element, which AIG concedes "requires only that 'a

corporation organized under the laws of the United States [*i.e.*, a federally

chartered bank] shall be a *party [to the suit]*'" (*id.* at 39 (quoting Section 632)

(alterations and emphasis in the original)), and the third, transaction-based element,

- 49 -

requiring only that the suit "aris[es] out of transactions involving" foreign or territorial banking.

The district court was correct in adhering to "the Edge Act's two-fold requirement of a national bank and a foreign transaction." (SPA 7.) Section 632's plain language treats the party- and transaction-based elements as separate, setting them apart with independent clauses and a comma: "all suits of a civil nature ... to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving [foreign or territorial banking]." The words "to which" make clear that the party requirement modifies only the "all suits" language, not the *subsequent* clause requiring suits to "aris[e] out of" transactions with a foreign or territorial nexus. *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (invoking "the grammatical 'rule of the last antecedent,' according to which a limiting clause or phrase ... should ordinarily be read as modifying only the noun or phrase that it immediately *follows*") (emphasis added). The comma separating the two elements confirms that they are separate, independent requirements. *See, e.g.*, *United States v. Ron Pair Ents., Inc.*, 489 U.S. 235, 241 (1989) (construing statutory phrase that was "set aside by commas" as "stand[ing] independent of the language that follows"). "The language and punctuation Congress used cannot be read in any other way." *Id.* at 242.

In order to collapse these elements, and require that a national bank be directly involved in the foreign or territorial banking transaction, AIG must again rewrite the statutory text and cast aside settled canons of construction. Because AIG's interpretation forces the party requirement to modify a *subsequent* noun ("transaction") in a separate element ("arising out of a transaction…"), it "disregards—indeed, is precisely contrary to—the grammatical 'rule of the last antecedent.'" *Barnhart*, 540 U.S. at 26. Had Congress intended to predicate jurisdiction on a federally-chartered corporation being involved in a foreign or territorial banking transaction, and not just a party to the suit, it would have said so. *See Boatswain v. Gonzales*, 414 F.3d 413, 418 (2d Cir. 2005) (refusing to insert language which, "had it been intended, would surely have warranted express pronouncement and could have been easily included" by Congress). The text already uses the word "involving," easily permitting Congress to qualify "transactions" with "involving a corporation organized under the laws of the United States *and* banking ...." But Congress did not do that; it instead used plain English to break the party and transaction requirements into distinct elements.

It comes as no surprise, then, that every decision setting out the requirements of Section 632 has treated these elements as separate.[8] AIG asserts that "numerous

---

[8] *See, e.g.*, *Highland Crusader*, 627 F. Supp. 2d at 732; *Jana*, 490 F. Supp. 2d at 328; *Lemgruber*, 385 F. Supp. 2d at 213; *Bank of New York*, 861 F. Supp. at 231-

courts" have "interpreted" Section 632 to require the federally chartered bank to have been involved in the banking transaction.  (AOB 39.)  It cites only *one* unpublished decision for that requirement, however, and that decision is not based upon an independent construction of Section 632.[9]  (AOB 39.)  Instead, the cited decision quoted from an earlier unpublished decision for the proposition that "a court must be satisfied that a plaintiff's claims 'really involve[] a banking arrangement between a federally chartered bank and a foreign party.'"  *Societe d'Assurance de l'Est SPRL v. Citigroup Inc.*, 2011 WL 4056306, at *4 (S.D.N.Y. Sept. 13, 2011) (quoting *Lazard Freres & Co. v. First Nat'l Bank of Md.*, 1991 WL 221087, at *2 (S.D.N.Y. Oct. 15, 1991)).  The language from the earlier decision, *Lazard Freres*, was not based on a construction of Section 632 either; it was characterizing this Court's decision in *CVF*, which it described as "dissect[ing] the claims … to see whether any of them really involved a banking arrangement between a federally chartered bank and a foreign party." *Lazard Freres*, 1991 WL 221087, at *2.  But, as AIG itself concedes, *CVF* does not even "discuss[]" the rule

---

32; *Foy*, 2009 WL 3672921, at *2; *Pinto*, 2003 WL 21297300, at *2; *Stamm v. Barclays Bank of New York*, 1996 WL 614087, at *2 (S.D.N.Y. Oct. 24, 1996).

[9]  AIG cites other decisions that it contends "involved facts that satisfied" this proposed rule, but which it concedes do "not discuss[] this requirement."  (AOB 39-40.)  Because AIG's proposed party involvement element was not "ruled upon" but "merely lurk[ed] in the record," those decisions have no force on this point. *Webster v. Fall*, 266 U.S. 507, 511 (1925).

that AIG now advances as a "requirement" of Section 632, let alone embrace it. (AOB 39.)

Unable to identify a supporting source of legislative intent, AIG raises the specter of constitutional conflict. (AOB 40-43.) AIG never so much as mentioned this constitutional issue or the avoidance canon in the court below, and its belated arguments cannot anchor AIG's countertextual interpretation on appeal. At the threshold, "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction[.]" *Clark v. Martinez*, 543 U.S. 371, 385 (2005); *see also Spina v. Dep't of Homeland Security*, 470 F.3d 116, 130 (2d Cir. 2006) (same). The canon does not permit courts to adopt constructions that are not "reasonable" or that are "plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Because AIG's proposed interpretation is not reasonable, but instead would "press statutory construction to the point of disingenuous evasion," AIG cannot use the canon to avoid any constitutional questions. *Miller v. French*, 530 U.S. 327, 312 (2000) (citation omitted) (internal quotation marks omitted); *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) (courts cannot "'pervert[] the purpose of a statute ... or judicially rewrit[e] it'" in order to avoid a constitutional question) (citations omitted).

In any event, despite AIG's efforts to conjure a question of constitutional dimensions, there is no risk that exercising jurisdiction here would "extend[] § 632 into a zone of probable unconstitutionality." (AOB 43.) AIG maintains that unless the second and third elements of Section 632 are collapsed, the statute would "exceed[] Congress's powers under Article III," by conferring federal jurisdiction over "cases involving no federal issue." (*Id.* at 40.) But the sole case cited by AIG in support of its constitutional avoidance theory, *A.I. Trade*, 62 F.3d 1454, *upheld* the constitutionality of Section 632, and did so on grounds that had nothing to do with conflating the two elements.

In *A.I. Trade*, the D.C. Circuit reasoned that the validity of Section 632 under Article III turned on whether it was enacted "for the general purpose of ensuring the proper administration of some federal law (although the disputed issues in any specific case may be confined to matters of state law)." 62 F.3d at 1461-62. After noting that the "substantive law implicated in the grant of jurisdiction found in § 632 is the Edge Act," the Court determined that the statute created a "new type of federally controlled institution [*i.e.*, Edge Act corporations] intended to increase the stability of, and the public's confidence in, international markets," and placed federal regulations on such corporations "to facilitate and stimulate international trade by providing the uniformity of federal law." *Id.* The Court held that those corporations "are governed by specific provisions of federal

law," a regime that "lies close enough to the heart" of cases covered by Section

632 "to sustain the assertion of federal subject-matter jurisdiction." *Id.* at 1462-63.

*A.I. Trade* thus did *not* hold Section 632 constitutional "on a basis that

turned on the involvement of the federally chartered corporation in the

international banking transaction," as AIG asserts (AOB 42).  Rather, the D.C.

Circuit focused on "[t]he *substantive* law" governing Edge Act corporations in

assessing the constitutionality of Section 632.  62 F.3d at 1462 (emphasis added).

The Court's rationale for upholding the statute—that "there is enough substantive

federal law underlying the grant of jurisdiction"—applies equally to cases

involving national banks like BANA.  *Id.* at 1463.  The foreign activities of

federally-chartered banks were a major concern of Congress in enacting the Glass-

Steagall Act (*see supra* at 39-40), and those activities also "are governed by

specific provisions of federal law," 62 F.3d at 1463; *see* 12 U.S.C. §§ 501-04.  If a

national bank is a party to the litigation, "an issue of federal law might well arise"

regardless of whether the bank was directly involved in the jurisdictional banking

transaction.

More important, regardless of how frequently issues of federal law might

generally arise in a case with a national bank as a party, issues of federal law are

*certain* to arise in this case—foreclosing any Article III challenge.  AIG's

Complaint asserts federal claims under Sections 11, 12, and 15 of the Securities

Act of 1933 (Compl. ¶¶ 475-509; JA 236-44.)  Having filed a Complaint alleging

that Defendants are liable for billions of dollars under federal securities laws, AIG

has itself ensured that the application of Section 632 in this case will not be

"devoid of federal law" (AOB 41 (quoting 62 F.3d at 1461)), and will thus satisfy

Article III concerns.

What is more, even if Section 632 could be read to require a federally-

chartered defendant's involvement in the jurisdictional transaction, the requirement

would be met here.  As the district court concluded, AIG's Complaint seeks

damages from BANA, the federally-chartered defendant, based upon its supposed

status as a successor-in-interest to Countrywide entities.  (SPA 12-13; *see also*

Compl. ¶ 75; JA 86.)  That is all the statute requires, for it frames the party

requirement solely in terms of the time the lawsuit was filed.  *See* 12 U.S.C. § 632

("all suits … to which any corporation organized under the laws of the United

States shall be a party").  And it is fundamentally inconsistent for AIG to aver that

BANA may be held liable for transactions undertaken by Countrywide while at

once arguing that BANA was not "involved" in the selfsame transactions for

Section 632 purposes.

### D.    Section 632 Contains No "*De Minimis*" Exception

In what is perhaps its most radical departure from Congress's jurisdictional

grant, AIG urges the Court to establish a "*de minimis*" exception to Section 632.

AIG does not even make a pretense of grounding this exception in statutory construction principles. It points to no text or legislative history evincing an intent to create some sort of transactional threshhold for Edge Act jurisdiction. Nor does it cite any case law endorsing this construction. (*See* SPA 7.)

The natural reading of the Edge Act is that a "suit satisfies the jurisdictional requisites of Section 632 if *any part of it* arises out of transactions involving international or foreign banking." *In re Lloyd's*, 928 F. Supp. at 338 (citing *CVF*, 629 F.2d 786) (emphasis added). As a counterweight to this reading, AIG offers mere supposition. It muses that "Congress surely did not intend that such a tenuous connection to territorial banking could suffice to confer federal jurisdiction" because "any such notion is surely the tail wagging the proverbial dog." (AOB 44.) But the Court cannot "ignore a clear jurisdictional statute in reliance upon supposition of what Congress *really* wanted." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 237 (2007) (emphasis in original). Nor is there anything unusual about Congress adopting a jurisdictional statute that admits of no *de minimis* exceptions. Such bright-line grants of jurisdiction are found throughout the United States Code, and even elsewhere in Section 632 itself. *See, e.g.*, 12 U.S.C. § 632 (federal jurisdiction over all civil suits to which any Federal Reserve bank is a party).

Indeed, AIG's own subsidiaries have recently and emphatically embraced this text-based understanding of Section 632.  In resisting a remand motion filed in a case where they were named as defendants, AIG's subsidiaries argued that there is "jurisdiction if some transactions out of which the case arises involve international banking even if the majority are purely domestic."  (Opp'n to Pl.'s Motion to Remand to State Court at 10 n.7, *City of Stockton v. Bank of America, N.A.*, No. CV 08-4060-MMC, (N.D. Cal. Oct. 3, 2008) Dkt. No. 27.)

It makes good sense that Congress chose to define Edge Act jurisdiction with a bright-line rule that admits of no exception where the number of foreign or territorial transactions is relatively small.  "Jurisdictional rules should be as simple as possible, so that the time of litigants and judges is not wasted deciding where a case should be brought and so that fully litigated cases are not set at naught … because a subtle jurisdictional bar was overlooked until the appeal."  *Cote v. Wadel*, 796 F.2d 981, 983 (7th Cir. 1986) (Posner, J.); *see also Emerald Investors Trust v. Gaunt Parsippany Partners*, 492 F.3d 192, 204 (3rd Cir. 2007) ("[A] bright-line rule is preferable to a case-by-case functional rule as it is the most efficient rule to utilize in determining whether a district court has subject matter jurisdiction").  In construing statutes conferring subject matter jurisdiction, the Supreme Court "place[s] primary weight upon the need for judicial administration of a jurisdictional statute to remain as simple as possible."  *Hertz Corp. v. Friend*,

130 S. Ct. 1181, 1186 (2010).  By conferring subject matter jurisdiction regardless of the number or magnitude of foreign or territorial transactions giving rise to the suit, *Pinto*, 2003 WL 21297300, at *3, the textual interpretation of Section 632 provides these advantages.

AIG is wrong when it argues that this textual approach entails "'an inherently limitless view' of Edge Act jurisdiction.'"  (AOB 45 (quoting *Sollitt*, 2012 WL 284389, at *3).)  The jurisdictional limits that Congress actually wrote into the statute have real purchase.  The "suit must be civil in nature"; one party must be "a corporation organized under the laws of the United States"; and the suit must "arise[] out of a transaction involving international or foreign [or territorial] banking."  *Pinto*, 2003 WL 21297300, at *2 (citation omitted).  The scant number of cases finding jurisdiction under Section 632 in the nearly 80 years since its enactment is a testament to just how targeted this congressional grant of jurisdiction is.

By contrast, the novel exception to Section 632 that AIG now proposes would create uncertainty, inconsistency, and inefficiency in this area of the law.  Edge Act cases often involve complex transactions.  (*Supra* at 28-29.)  A vague *de minimis* exception would leave litigants unable to predict with accuracy whether their cases are subject to the jurisdiction of the federal courts.  It would make it impossible for lower courts to apply Section 632 in a consistent fashion,

contravening Congress's objective of "a more uniform and predictable system of dispute resolution." *Foy*, 2009 WL 3672921, at *2. And it would greatly increase the risk of "fully litigated cases" being "set at naught" where the Court of Appeals disagrees with the district court's application of a fuzzy *de minimis* exception. *Cote*, 796 F.2d at 983.

It is telling that AIG offers no guidance or authority on what the bounds of its proposed *de minimis* exception would be. It merely asks the Court to hold that the territorial banking activity in *this* case is "*de minimis*," "[w]hatever the threshold percentage of territorial banking transactions" might be. (AOB 45.) That does not make for a judicially administrable rule.

When Congress does intend to limit a jurisdictional grant, "Congress [knows] full well" how to do so. *Franklin Nat'l Bank Secs. Litig. v. Andersen*, 532 F.2d 842, 845 (2d Cir. 1976). Indeed, Congress did just that in Section 632, such as by explicitly limiting the right of removal in cases involving Federal Reserve Banks to the bank itself. *See id.* (discussing Section 632). Had Congress wanted to predicate the "arising out of" basis for jurisdiction in Section 632 on the size or significance of transactions, it could have done so. *Cf.* 28 U.S.C. § 1332 (limiting diversity jurisdiction to cases "where the matter in controversy exceeds the sum or value of $75,000"). Congress chose not to incorporate a *de minimis* exception into

the Edge Act's jurisdictional grant, however, and that should be fatal to AIG's

argument.

## CONCLUSION

This Court should affirm the district court's exercise of subject matter

jurisdiction under the Edge Act.

Dated:  August 31, 2012                      Respectfully submitted,


                                             MUNGER, TOLLES & OLSON LLP
                                                  Marc T.G. Dworsky
                                                  Michael J. Mongan

                                             By:  */s/ Fred A. Rowley, Jr.*
                                                  Fred A. Rowley, Jr.

                                             355 South Grand Avenue, 35th Floor
                                             Los Angeles, California 90071
                                             Tel: 310-683-9100

                                             *Counsel for Defendants-Appellees*
                                             *Banc of America Securities LLC, Bank of*
                                             *America, National Association, Banc of*
                                             *America Funding Corporation, Banc of*
                                             *America Mortgage Securities, Inc., Asset*
                                             *Backed Funding Corporation, NB Holdings*
                                             *Corporation, Merrill Lynch & Co., Inc.,*
                                             *Merrill Lynch Mortgage Lending, Inc., First*
                                             *Franklin Financial Corporation, Merrill*
                                             *Lynch Mortgage Capital Inc., Merrill Lynch*
                                             *Credit Corporation, Merrill Lynch, Pierce,*
                                             *Fenner & Smith Incorporated, and Merrill*
                                             *Lynch Mortgage Investors, Inc.*

REED SMITH LLP
    Amy J. Greer
    Colin E. Wrabley

By: */s/ James C. Martin*
    James C. Martin

599 Lexington Avenue
New York, New York 10022
Tel: 212-521-5400

*Counsel for Defendants-Appellees*
*Countrywide Financial Corporation,*
*Countrywide Capital Markets LLC,*
*Countrywide Home Loans, Inc.,*
*Countrywide Securities Corporation,*
*CWABS, Inc., CWALT, Inc., CWHEQ, Inc.,*
*and CWMBS, Inc.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

This brief complies with the type-volume limitation of FRAP 32(a)(7)(B) because it contains 13,938 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

MUNGER, TOLLES & OLSON LLP

By: _/s/ Fred A. Rowley, Jr._
       Fred A. Rowley, Jr.

355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Tel: 310-683-9100

*Counsel for Defendants-Appellees*
*Banc of America Securities LLC, Bank of America, National Association, Banc of America Funding Corporation, Banc of America Mortgage Securities, Inc., Asset Backed Funding Corporation, NB Holdings Corporation, Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Lending, Inc., First Franklin Financial Corporation, Merrill Lynch Mortgage Capital Inc., Merrill Lynch Credit Corporation, Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Merrill Lynch Mortgage Investors, Inc.*

REED SMITH LLP

By: _/s/ James C. Martin_
       James C. Martin

599 Lexington Avenue
New York, New York 10022
Tel: 212-521-5400

*Counsel for Defendants-Appellees
Countrywide Financial Corporation,
Countrywide Capital Markets LLC,
Countrywide Home Loans, Inc.,
Countrywide Securities Corporation,
CWABS, Inc., CWALT, Inc., CWHEQ, Inc.,
and CWMBS, Inc.*